1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10

11   Carlos LEON,                        Case No.:  20-cv-00899-AJB-BGS
12                          Plaintiff,
                                         **REPORT & RECOMMENDATION**
13   v.                                  **GRANTING DEFENDANTS'**
                                         **MOTION FOR SUMMARY**
14   Alvaro CELAYA, *et al.*,            **JUDGMENT [ECF No. 32]**
15                          Defendants.
16
17

18        Carlos Leon ("Plaintiff"), currently incarcerated at Centinela State Prison ("CEN")
19   located in Imperial, California, is proceeding *pro se* and *in forma pauperis* ("IFP") in this
20   civil rights action filed pursuant to 42 U.S.C. § 1983.  (*See* ECF Nos. 1, 3.)   In the
21   Complaint, Plaintiff alleged Eighth Amendment excessive force and First Amendment
22   retaliation claims against Defendant Alvaro Celaya and Defendant James Martinson
23   ("Defendants"). (*See* ECF No. 1.)  Defendants moved for summary judgment on Plaintiff's
24   Complaint contending: (1) Plaintiff failed to properly exhaust available administrative
25   remedies before filing suit; (2) Defendants are also entitled to summary judgment on the
26   merits of Plaintiff's First Amendment retaliation claim; (3) Defendants are also entitled to
27   summary judgment on the merits of Plaintiff's Eighth Amendment claim; and (4)
28   Defendants are also entitled to Qualified Immunity.  (ECF No. 32 at 10–21.)  Plaintiff filed

an opposition to the motion for summary judgment ("Opposition") and Defendants' filed a reply in support of their motion ("Reply").  (ECF Nos. 44, 47.)

This Report and Recommendation is submitted to United States District Judge Anthony J. Battaglia pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.   Based on the documents and evidence presented, and for the reasons set forth below, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment (ECF No. 32) be **GRANTED**.

## I.  FACTUAL BACKGROUND

On May 13, 2020, Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983, alleging Eighth Amendment excessive force and First Amendment retaliation claims against Defendants. (ECF No. 1.)  Plaintiff's claims arose from a cell search on January 9, 2019. (ECF Nos. 1 at 3–4; 32 at 3–8; 44 at 2–3; 44-1 at 4–14.)  In his complaint, Plaintiff claimed that Defendant Celaya targeted Plaintiff's cell for a search and "decided to over tighten" Plaintiff's handcuffs while the search was conducted in retaliation for grievances that Plaintiff submitted against Defendant Celaya.  (ECF No. 1 at 3.)  Plaintiff alleged that when he complained about the handcuffs being too tight, Defendant Celaya told Plaintiff that his handcuff key was broken and left the handcuffs on Plaintiff for hours and until a mass cell search concluded.  (ECF Nos. 1 at 3–4; 44 at 2–3; 44-1 at 21–25.)  Plaintiff also claimed that Defendant Martinson "allowed his subordinate, [Defendant] Celaya, under his direct supervision to use excessive force while Plaintiff was cuffed."  (*Id.* at 4.)  Plaintiff alleged that he complained to Defendant Martinson that his handcuffs were too tight, and that Defendant Martinson did not loosen the handcuffs.  (*Id.*)

Plaintiff also alleged that the officers used excessive force in retaliation for grievances he filed concerning abusive and unethical conduct by some correctional staff. (ECF Nos. 1 at 3–4; 44 at 2–3; 44-1 at 18–21.)  Plaintiff indicated that he had previously sought and exhausted all forms of available relief from the proper administrative officials regarding the acts alleged in the complaint.  (ECF No. 1 at 6.)  Plaintiff indicated that he

had proceeded to all administrative levels "including Health care Head Quarters for sustained injuries." (*Id.*)

## II. PROCEDURAL BACKGROUND

Plaintiff initiated this action by filing his Complaint and IFP motion on May 13, 2020. (ECF No. 1.)  The Court granted Plaintiff's IFP motion, screened the complaint, and directed the U.S. Marshall to effect service of the complaint and summons onto the named defendants, pursuant to 28 U.S.C. § 1915(d) and Federal Rule of Civil Procedure 4(c)(3). (*See* ECF No. 3.)  On January 4, 2021, Defendant Celaya and Defendant Martinson filed their Answer to Plaintiff's Complaint.  (ECF No. 6.)  The Court then determined that neither an Early Neutral Evaluation Conference nor a Case Management Conference was needed in this case, pursuant to Civil Local Rule 16.1(e)(8), and issued its Scheduling Order Regulating Discovery and Other Pre-trial Proceedings.  (ECF No. 7.)  Among the deadlines provided in the Scheduling Order, the Court provided October 11, 2021 as the deadline for all other dispositive motions, including those addressing Daubert issues.  (*Id.* at 4.)

Plaintiff filed his first Motion for Appointment of Counsel on January 25, 2021 and his second Motion for Appointment of Counsel on February 4, 2021, which were both denied on February 12, 2021.  (ECF Nos. 9, 11, 13.)  On June 3, 2021, despite finding that Plaintiff failed to show good cause and due diligence in his request, the Court granted Plaintiff's request to amend the scheduling order to extend the fact discovery deadline. (ECF Nos. 15, 17.)  On June 14, 2021, Plaintiff filed a motion requesting an independent expert, which was denied on June 18, 2021.  (ECF Nos. 21, 22.)  On September 9, 2021, Plaintiff filed his third Motion for Appointment of Counsel, which was denied on October 26, 2021.  (ECF Nos. 26, 34.)  On October 15, 2021, the Court granted Defendants' Motion for Ex Parte Application to Modify Scheduling Order, which extended the dispositive motion deadline from October 11, 2021 until October 19, 2021.  (ECF Nos. 29, 31.)

On October 19, 2021, Defendants filed their Motion for Summary Judgment.  (ECF No. 32.)  The Court then issued its order providing notice of motion for summary judgment

pursuant to *Klingele v. Eikenberry* and *Rand v. Rowland*, and setting a briefing schedule on Defendants' Motion for Summary Judgment. (ECF No. 33.) On December 3, 2021, the Court granted in part Plaintiff's Ex Parte Motion for Extension of Time and amended the briefing schedule. (ECF Nos. 35, 37.) This Order indicated that Plaintiff shall file an Opposition, if any, to the Defendants' Motion for Summary Judgment on or before January 3, 2022 and that any reply by Defendants shall be filed on or before January 18, 2022. (ECF No. 37 at 2.) Plaintiff's Opposition to Defendants' Motion for Summary Judgment was filed on January 5, 2022, with Defendants' Reply being filed on January 18, 2022. (ECF Nos. 44, 47.)

The Court then granted Defendants' Ex Parte Motions to Amend the Schedule and vacated the Mandatory Settlement Conference set for December 29, 2021 and Pre-trial Conference set for February 10, 2022, as well as the related pretrial deadlines, pending the Court's decision on the Defendants' Motion for Summary Judgment. (ECF Nos. 38, 45.) The Court indicated that these dates will be reset, if appropriate, following the decision on the Motion for Summary Judgment. (*Id.*)

Further, the Court denied Plaintiff's motion for a temporary restraining order and a preliminary injunction on January 13, 2022. (ECF Nos. 40, 42, 46.) The Court found that Plaintiff was not entitled to a temporary restraining order or a preliminary injunction since Plaintiff had not established a likelihood of irreparable injury if he was not afforded injunctive relief. (ECF No. 46 at 3.)

## III. MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

4

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. The moving party can also satisfy this burden by showing that particular parts of materials in the record "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party has carried its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986)). The nonmoving party may not rely on allegations in the complaint, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis in original) (internal citation omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphasis in original). "An issue of material fact is genuine 'if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.'" *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)). If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.

At summary judgment, it is not the Court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson*, 477 U.S. at 249; *see also Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1123 (9th Cir. 2021) ("'[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' and 'all justifiable inferences are to be drawn in [the non-movant's] favor.'").  Inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.  Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If a party supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).

The factual allegations of a *pro se* inmate must be held "to less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Accordingly, in a civil rights case, the Court must construe the pleadings of a *pro se* plaintiff liberally and afford him the benefit of any doubt.  *Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).  "This rule is particularly important in civil rights cases."  *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992).  However, despite the liberal interpretation a court must give to *pro se* pleadings, it cannot provide "essential elements of the claim that were not initially pled."  *Ivey v. Bd. Of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).  "Vague and conclusory allegations of official participation in civil rights violations are not sufficient[.]"  *Id.*  Even a *pro se* plaintiff must specify "with at least some degree of particularity overt acts which defendants engaged in that support the plaintiff's claim."

*Jones v. Cmty. Redevelopment Agency of City of Los Angeles*, 733 F.2d 646, 649 (9th Cir. 1984).

The liberal standard applied to *pro se* plaintiffs does not relieve a plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment. *Veloz v. New York*, 339 F.Supp.2d 505, 513 (S.D.N.Y. 2004). Ordinary *pro se* litigants, like other litigants, must comply with the summary judgment rules. *Thomas*, 611 F.3d at 1150. *Pro se* inmates are, however, expressly exempted from strict compliance with the summary judgment rules. *Id.* Courts should "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Id.*

In addition, the Court may consider as evidence all contentions "offered [by a plaintiff] in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). This approach "exempts *pro se* inmates from strict compliance with the summary judgment rules, but it does not exempt them from all compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (citing *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013)).

## IV. DISCUSSION

In the Complaint, Plaintiff alleged Eighth Amendment excessive force and First Amendment retaliation claims against Defendants. (ECF No. 1 at 3–4.) Defendants moved for summary judgment on the grounds that: (1) Plaintiff failed to properly exhaust available administrative remedies before filing suit; (2) Defendants are also entitled to summary judgment on the merits of Plaintiff's First Amendment retaliation claim; (3) Defendants are also entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claim; and (4) Defendants are also entitled to Qualified Immunity. (ECF No. 32 at 10–21.) Each of these arguments are addressed in turn.

///

///

**A. Exhaustion of Administrative Remedies**

1. <u>Legal Standard</u>

The Prisoner Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is "mandatory." *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)); *McKinney v. Carey*, 311 F.3d 1198, 1200–01 (9th Cir. 2002). The exhaustion requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence. *See Porter*, 534 U.S. at 524–32; *see also Nettles v. Grounds*, 830 F.3d 922, 932 (9th Cir. 2016) (en banc), cert. denied, 137 S. Ct. 645, (2017); *Roles v. Maddox*, 439 F.3d 1016, 1018 (9th Cir. 2006).

Failure to exhaust is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (explaining that inmates are not required to plead specifically or demonstrate exhaustion in their complaints). "In a typical PLRA case, a defendant will have to present probative evidence [in a Rule 56 motion for summary judgment] [. . .] that the prisoner has failed to exhaust administrative remedies under § 1997e(a)." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc). Under the burden-shifting analysis recognized in *Albino*, "a defendant must first prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 767 (9th Cir. 1996)).

"Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172 (citing *Hilao*, 103 F.3d at 778 n.5 ("Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing

that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.")).  "The ultimate burden of proof, however, remains with the defendants, and the evidence must be viewed in the light most favorable to the plaintiff."  *Packnett v. Wingo*, No. 09-cv-00327-YGR-PR, 2015 WL 1478597, at *10 (N.D. Cal. Mar. 31, 2015) (citing *Williams*, 775 F.3d at 1191).  "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts."  *Albino*, 747 F.3d at 1166.

The Supreme Court has "held that to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' [. . .] – rules that are defined not by the PLRA, but by the prison grievance process itself."  *Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

The administrative appeal system for inmates in the California prison system is described in Title 15 of the California Code of Regulations: "Any inmate [. . .] under the [CDCR's] jurisdiction may appeal any policy, decision, action, condition, or omission by the department or its staff that the inmate [. . .] can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  For appeals submitted after January 28, 2011, inmates must commence the appeals process by submitting a CDCR Form 602 to the facility's appeals coordinator describing "the specific issue under appeal and the relief requested."  Cal. Code Regs. tit. 15, § 3084.2(a), (c).

Among other requirements, the appeal must be "limited to one issue or related set of issues" and "list all staff member(s) involved and shall describe their involvement in the issue."  Cal. Code Regs. tit. 15, § 3084.2(a)(1), (3).  "To assist in the identification of staff members, the inmate [. . .] shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate [. . .] does not have the requested identifying information about the

staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question." Cal. Code Regs. tit. 15, § 3084.2(a)(3).

"Administrative remedies shall not be considered exhausted relative to any new issue, information, or person later named by the appellant that was not included in the originally submitted CDCR Form 602 [. . .] and addressed through all required levels of administrative review up to and including the third level.  In addition, a cancellation or rejection decision does not exhaust administrative remedies."  Cal. Code Regs. tit. 15, § 3084.1(b).  If not satisfied with the first level response, a prisoner may submit a formal appeal for a second level review, which is "conducted by the hiring authority or designee at a level no lower than Chief Deputy Warden [. . .] or the equivalent."  Cal. Code Regs. tit. 15, § 3084.7(d)(2).  If the prisoner is not satisfied with the second level review, he may appeal to the third level of review by the chief of the Office of Appeals in Sacramento. Cal. Code Regs. tit. 15, § 3084.7(c), (d)(3).  "The third level review constitutes the decision of the Secretary of the California Department of Corrections and Rehabilitation on an appeal, and [. . .] exhausts administrative remedies." Cal. Code Regs. tit. 15, § 3084.7(d)(3).

2. <u>Analysis</u>

a.  Failure to Name Defendant Martinson

Defendants first claimed that Plaintiff did not exhaust administrative remedies as to Defendant Martinson because the Plaintiff did not list him in the grievance.  (ECF No. 32 at 18–19.)  Defendants cited to Exhibit A of L. Santana's Declaration, which contained Plaintiff's grievances regarding the January 9th incident.  (ECF No. 32-4 at 8.)  From a review of Exhibit A of L. Santana's Declaration, it is clear that Plaintiff never named Defendant Martinson in any of his grievances.  (*Id.* at 21–23.)

As discussed above, "[t]o assist in the identification of staff members, the inmate [. . .] shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal.  If the inmate [. . .] does not have the requested identifying information about the staff member(s), he or she

shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question." Cal. Code Regs. tit. 15, § 3084.2(a)(3)

Further, Plaintiff also failed to describe anything Defendant Martinson did that violated Plaintiff's rights. (*See* ECF No. 32-4 at 21–23.) A grievance that fails to set out the facts of the claims upon which the prisoner later sues does not put the prison on notice of the nature of the wrong and, for that reason, does not exhaust the prisoner's available administrative remedies. *See Fordley v. Lizarraga*, 18 F.4th 344, 358 (9th Cir. 2021) (affirming the district court's dismissal of the plaintiff's deliberate indifference claim against the warden due to failure to exhaust since plaintiff's grievances did not "name or refer to" the warden and there was no indication that the warden was aware of the alleged conduct); *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

Plaintiff asserted that during his February 2019 interview he clearly stated Defendants Celaya's and Martinson's involvement in the January 2019 incident. (ECF No. 44-1 at 12.) However, "[a]dministrative remedies shall not be considered exhausted relative to any new issue, information, or person later named by the appellant that was not included in the originally submitted CDCR Form 602 [. . .] and addressed through all required levels of administrative review up to and including the third level. In addition, a cancellation or rejection decision does not exhaust administrative remedies." Cal. Code Regs. tit. 15, § 3084.1(b).

Plaintiff's later naming Defendant Martinson at an interview was not also included in his February 6, 2019 CDCR Form 602. (*See* ECF No. 32-4 at 21–23.) Therefore, Plaintiff did not properly exhaust his administrative remedies as to Defendant Martinson. *See Parks v. Chappell*, No. C-13-4048-EMC(pr), 2015 WL 3466280, at *4–*5 (N.D. Cal. June 2015) (finding the plaintiff did not properly exhaust his remedies where he failed to name the defendant in his appeal although he could have done so); *Panah v. State of Cal. Dep't of Corr. and Rehabilitation*, 2015 WL 1263494, *9–*10 (N.D. Cal. 2015) (finding

that even if plaintiff's failure to pursue inmate appeal to highest level is excused, he failed to properly exhaust his claim against the warden because his inmate appeal did not name the warden or describe the basis for his liability); *Woodford*, 548 U.S. at 93 (finding that the PLRA exhaustion requirement requires "proper exhaustion").

### b. Timeliness

The Defendants argued that Plaintiff did not exhaust his administrative remedies because his grievance was cancelled due to untimeliness.  (ECF No. 32 at 19.)  Defendants cite to Howard E. Moseley's Declaration and its Exhibit B in support thereof.  (ECF No. 32-5 at 3–4, 10–11.)  This document is a letter, dated December 16, 2019, regarding the appeal that was cancelled by the Office of the Appeals because it was untimely, which was then returned to Plaintiff to notify him of the reason for the cancellation.  (*Id.* at 10–11.) The appeals examiner cancelled his third level of review in accordance with California Code of Regulation, title 15, § 3084.6.  (*Id.*)  Section 3084.6(c)(4) provides that an appeal may be cancelled because the time limits for submitting the appeal were exceeded.

Plaintiff filed his first level of review on February 6, 2019.  (ECF No. 32-5 at 12–14.)  Plaintiff's appeal was bypassed at the First Level of Review.  (*Id.*)  Staff notes indicated that Plaintiff's appeal was granted in part and was advised to complete his second level response.  (*Id.* at 13.)  Plaintiff's appeal noted that Plaintiff requested an interview, and the date to complete was March 16, 2019.  (*Id.*)

In a March 16, 2019 Memorandum, Plaintiff was notified that his allegations concerning the January 9, 2019 incident involving Defendant Celaya were pending review by ISU.  (*Id.* at 19.)  The Memorandum indicated that his petition was partially granted in that the appeal inquiry had been reviewed and all issues adequately addressed.  (*Id.* at 20.) Plaintiff's appeal was referred to an investigation to determine whether the evidence warrants further inquiry.  (*Id.*)  After that determination, Plaintiff would be notified.  (*Id.*) Plaintiff was advised that if he wished to exhaust administrative remedies, he must submit his staff complaint appeal through all levels of review up to and including the Third Level of Review ("TLR").  (*Id.* at 21.)

Of note, in the second level staff use only section, it indicated that Plaintiff received his SLR appeal package on March 21, 2019.  (*Id.* at 13.)  That section indicated that if Plaintiff was dissatisfied with the second level response, he was to complete section F. (*Id.*)  Plaintiff completed section F on September 18, 2019.  (*Id.*)  Section F advised Plaintiff that a response for TLR needed to have been received within 30 days of receipt of prior response.  (*Id.*)  Plaintiff submitted his third level response dated September 18, 2019, which was received September 27, 2019.  (*Id.* at 10, 12–14.)  Thereafter, on December 19, 2019, Plaintiff's third level response was cancelled due to an untimely response.  (*Id.* at 9–11, 13.)

Pursuant to § 3084.8(b)(3) of the California Code of Regulations, Plaintiff had 30 calendar days to submit his appeal to the TLR.  Section 3084.1(b) of the California Code of Regulations indicate that unless otherwise stated, all appeals are subject to a third level of review before administrative remedies are deemed exhausted.

 Plaintiff received his second level of review response March 21, 2019.  Plaintiff was advised that if he wished to exhaust administrative remedies, he must submit his staff complaint appeal through all levels of review up to and including the TLR.  (*Id.* at 18, 21.) Therefore, Plaintiff's response to the TLR had to be submitted within 30 days.  However, it was not received until September 27, 2019 and was therefore untimely.  (*Id.* at 12–14.) As such, the Court finds that the Defendant has met his burden that Plaintiff did not exhaust his administrative remedies due to his untimely TLR.

"Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Albino*, 747 F.3d at 1172 (citing *Hilao*, 103 F.3d at 778 n.5*); see also Sapp*, 623 F.3d at 822 (finding that the PLRA requires that an inmate exhaust only those administrative remedies "as are available." [ ] We have recognized that the PLRA therefore does not require exhaustion

when circumstances render administrative remedies "effectively unavailable.") (citing 42 U.S.C. § 1997e(a); *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010).)

In his complaint, Plaintiff declared that he exhausted administrative remedies and was "denied at every level[.]" (ECF No. 1 at 6.) In his Opposition, Plaintiff claimed that he filed a grievance regarding the January 2019 incident, which Plaintiff claimed "went through all levels[.]" (ECF No. 44-1 at 11.) Plaintiff maintained that he filed his grievance at the first level on February 6, 2019, the second level on March 21, 2019, and the third level on September 18, 2019. (*Id.* at 12–13.) Plaintiff pointed to his Exhibit J, which is a cancellation letter from the CDCR dated December 16, 2019 informing Plaintiff that his appeal for TLR was received more than 30 days after Plaintiff received the March 21, 2019 SLR response and is thus being cancelled pursuant to California Code of Regulation, title 15, § 3084.6. (ECF No. 44-3 at 72–79.) Plaintiff claimed that he was misled into thinking the time limits had been extended due to the missing attachment "E-4" which he never received.[1] (ECF No. 44-1 at 13.) Plaintiff then decided that he could not wait for the missing documents and filed his grievance as best he could. (*Id.*) The court notes that other than the December 16, 2019 cancellation letter, (ECF Nos. 32-5 at 53–54; 44-3 at 72), there is no other document notifying Plaintiff of the "E-4" attachment. Nor does Plaintiff indicate when he became aware of the "E-4" attachment. Given that the record shows that Plaintiff received notice of the "E-4" attachment on December 19, 2019, (*Id.*), Plaintiff could not have been waiting for attachment "E-4" to file his TLR in a timely fashion.

---

[1] Plaintiff's Exhibit J is a copy of the December 16, 2019 letter indicating that the second SLR, dated August 19, 2019, was inappropriately issued. (ECF No. 44-3 at 35–37, 71–79.) This was determined to be an administrative error and that Plaintiff was to be provided attachment "E-4" which would inform him whether staff violated policy. (*Id.* at 72.) The letter indicated that this second SLR provided was an error and did not extend filing requirements. (*Id.*) Plaintiff's appeal to the third level was cancelled as untimely in that it was not received until September 27, 2019. (*Id.* at 72–73.) Plaintiff did not dispute that the August 19, 2019 letter was sent in error.

Further, to the extent Plaintiff claimed that he was misled into believing that the August 19 letter extended the filing deadline for his appeal for TLR, administrative remedies were still available, of which Plaintiff did not avail himself.  The SLR appeal packet was returned to Plaintiff on March 21, 2019.  (ECF No. 32-5 at 10, 13.)  In this SLR appeal packet, Plaintiff was advised that if he wanted to exhaust administrative remedies, he had to submit his staff complaint to the TLR.  (*Id.* at 21.)  Thus, Plaintiff's administrative remedies were available for him to file his TLR 30 days after March 21, 2019.  Plaintiff did not receive the erroneous Memorandum until August 19, 2019.  (*Id.* at 16.)  Plaintiff submitted his dissatisfaction with the second level response on September 18, 2019, which was received by staff on September 27, 2019.  (*Id.* at 13.)  Any reliance on that erroneous August 19, 2019 letter would necessarily have been after his deadline to appeal for TLR, which was 30 days after March 21, 2019.

Therefore, the Court finds that administrative remedies were available to Plaintiff and that his appeal for TLR was untimely.  IT IS RECOMMENDED that the Court find that Plaintiff failed to exhaust administrative remedies and GRANT Defendants' motion for summary judgment on this issue.

## B. Plaintiff's Eighth Amendment Excessive Force Claim

### 1. Legal Standard

The use of excessive force by a prison official constitutes a violation of the Eighth Amendment.  *See Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).  The core judicial inquiry is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Id.*; *see also Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 795 (9th Cir. 2018).  Factors pertinent to this determination are the need for the application of force, the relationship between the need and the amount of force that was used, the perceived threat, efforts to temper the severity of the response to the threat, and the extent of the injury inflicted.  *See Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321.

Notably, each malevolent touch by a prison guard does not give rise to a federal cause of action. *Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")). The Eighth Amendment's prohibition on cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided the force is not of a sort "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10.

In general, in cases where tight handcuffing was found to constitute excessive force, the plaintiff was in visible pain, repeatedly asked the defendant to remove or loosen the handcuffs, had pre-existing injuries known to the defendant, or alleged other forms of abusive conduct by the defendant. *See Shaw v. City of Redondo Beach*, 2005 WL 6117549, at * 7 (C.D. Cal. 2005) (citing *Wall v. Cty. of Orange*, 364 F.3d 1107, 1109–10 (9th Cir. 2004); *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003); *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1322–23 (9th Cir. 1995); *Palmer v. Sanderson*, 9 F.3d 1433, 1434 (9th Cir. 1993); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989)) ("In those tight handcuffing cases in which courts have found excessive force, the arrestee was either in visible pain, complained of pain, alerted the officer to pre-existing injuries, sustained more severe injuries, was in handcuffs for a longer period of time, asked to have the handcuffs loosened or released, and/or alleged other forms of abusive conduct in conjunction with the tight handcuffing."); *see also Taylor v. Cesarez*, No. 509CV00240CJCSK, 2018 WL 6136154, at *6 (C.D. Cal. June 2018) ("In those cases in which tight handcuffing has been found to constitute unreasonable force, factors in addition to the tight handcuffing were shown, including other forms of abusive conduct in conjunction with the handcuffing (such as physical violence) and/or the plaintiff's visible pain or complaints of pain, advice to the defendant of pre-existing injuries, and/or request(s) that the defendant remove or loosen the handcuff"); *Smith v. Yarborough*, No. CV044502DSFJTL, 2008 WL 4877464, at *12 (C.D. Cal. Nov. 7, 2008) ("In general, in cases where tight handcuffing was found to constitute excessive force, the

plaintiff was in visible pain, repeatedly asked the defendant to remove or loosen the handcuffs, had pre-existing injuries known to the defendant, or alleged other forms of abusive conduct by the defendant."), *aff'd*, 578 F. App'x 721 (9th Cir. 2014).

However, a single complaint relating to tight handcuffs is not sufficient to show that the handcuffing constituted excessive force. *See Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (arresting officer entitled to summary judgment when arrestee complained that handcuffs too tight only once, experienced redness on wrists for less than two days, and did not receive medical care); *Shaw*, 2005 WL 6117549, at *7 (15-minute handcuffing during which arrestee only once complained to defendant officer that her handcuffs were tight did not constitute excessive force).

2.   Parties Positions

In his complaint, Plaintiff alleged that Defendant Celaya knowingly committed a deliberate indifference when he decided to overtighten the cuffs during a mass search. (ECF No. 1 at 3.)  Plaintiff claimed that Defendant Celaya was made aware of his cuffs being too tight.  (*Id.*)  Defendant Celaya allegedly stated "[m]y cuff key is broken" and left the cuffs on for hours, until the mass search concluded.  (*Id.*)  Plaintiff maintained that Defendant Celaya did this for punitive purposes due to Plaintiff filing grievances.  (*Id.*)

In his opposition to the motion for summary judgment, Plaintiff claimed that he was searched by an officer to which Plaintiff had made numerous grievances and complied with the order to be cuffed.  (ECF No. 44 at 2.)  After being escorted to the day room, Plaintiff claimed to have complained to supervisors regarding the tightness of the cuffs but was ignored.  (*Id.*)  Later in his opposition, Plaintiff stated that he was placed in cuffs, escorted downstairs to the day room while no conversation taking place, only orders.  (ECF No. 44-1 at 7.)  Once the search was in progress, Plaintiff exchanged words with Defendant Martinson regarding the cuffs.  (*Id.*)  Plaintiff's requests went unanswered until Officer Felix was done with the search and then uncuffed Plaintiff.  (*Id.*)  Plaintiff noted that the excessive force claim is based on one handcuff being too tight.  (*Id.* at 24.)  Plaintiff

asserted that Defendant Celaya did this act because he had hostility against Plaintiff for filing grievances against him.  (*Id.*)

Plaintiff claimed that he was interviewed in February 2019 and photos were taken of his injuries caused by excessive force.  (*Id.* at 2.)  Plaintiff claimed that he showed the nurse his bruised wrist and was told to submit a separate medical request.  (*Id.* at 8.)  Plaintiff claimed that the medical requests were initiated for broken eyeglasses and wrist.  (*Id.* at 3.)  Plaintiff stated that he submitted medical requests for his injuries and grievances.  (*Id.* at 7–8.)

In his declaration, Plaintiff reiterated that the overly tightened cuffs were left on until the search ended.  (ECF No. 44-4 at 3.)  Plaintiff also declared that in October 2021 he was referred to a hand specialist since the cortisone treatments had minimal effect.  (*Id.* at 4.)  On December 28, 2021, Plaintiff was seen by a specialist who had scheduled surgery in the coming weeks.  (*Id.*)  Plaintiff claimed that this injury was caused by the handcuffing incident.  (*Id.*)

The Defendants submitted their version of the events that took place on January 9, 2019 and cited to records to support its version.  (*See* ECF No. 32.)  The Court will summarize the Defendants' version and cite to their Motion for Summary Judgment which listed the sources of information.

Defendant Celaya and his partner Officer Felix were randomly selected during a mass search to search Plaintiff's cell.  (*Id.* at 12.)  Officer Felix found a Samsung charger in a peanut butter container.  (*Id.* at 12–13.)  Officer Felix then documented his findings in a rules violation report.  (*Id.* at 13.)  According to Plaintiff, he complained that his handcuffs were extra tight and Defendant Celaya told Plaintiff that he could not loosen them because the handcuff key was broken.  (*Id.*)  Plaintiff claimed that both Defendant Celaya and Defendant Martinson told him that they would get someone in a few minutes to loosen them.  (*Id.*)  In an interview following the incident, Plaintiff stated that Officer Felix loosened the handcuffs when Plaintiff was in the dayroom.  (*Id.*)  Plaintiff stated that the handcuffs were loosened before Defendant Celaya and Officer Felix conducted the

search of his cell.  (*Id.*)  At his deposition, Plaintiff stated that Officer Felix did not loosen the handcuffs before the search and were not removed until hours later.  (*Id.* at 13 n.1.)

On January 10, 2019, Plaintiff submitted a CDCR Form 22 where he complained his property was damaged during the search but made no mention of his handcuffs being too tight. (*Id.* at 13–14.)  Plaintiff's health care request form he submitted on January 15, 2019 made no mention of any issues regarding wrist pain or the handcuffing incident.  (*Id.* at 14.)  On January 17, 2019, Plaintiff was medically assessed in response to his request.  (*Id.*)  There was no indication of any wrist issues or pain.  (*Id.*)  In March 2019, Plaintiff was again seen for a medical visit  where he complained of chronic right wrist pain only related to heavy lifting.  (*Id.*)  Plaintiff made no mention of left wrist pain or injury from the handcuffing incident.  (*Id.*)

### 3.   Analysis

The issue presented is whether Defendant Celaya over tightened the handcuff maliciously or sadistically to cause Plaintiff harm.  *See Hudson*, 503 U.S. at 6–7; *Whitley*, 475 U.S. at 320–21.  The Plaintiff filed a 602 grievance at the first level of appeal on February 6, 2019.  (ECF No. 32-4 at 11–12.)  In that 602 grievance, Plaintiff claimed that Defendant Celaya made sure the cuffs were extra tight.  (*Id.* at 3.)  Plaintiff then indicated that Defendant Celaya stated that the cuffs could not be loosened due to a broken key.  (*Id.*)  In turn, Defendant Celaya declared under penalty of perjury that he did not recall Plaintiff informing him that the handcuffs were extra tight during the mass cell search on January 9, 2019.  (ECF No. 32-2 at 3.)  Defendant Celaya stated that if there was an issue with Plaintiff's restraints that he was unable to address, there were multiple officers, supervisory staff, and medical staff present that Plaintiff could have requested assistance from.  (*Id.*)

On January 10, 2019, Plaintiff filed a CDCR Form 22 Request.  (ECF No. 32-3 at 9.)  In this request, Plaintiff complained that Defendant Celaya and Officer Felix damaged property during the January 9, 2019 search of his cell.  (*Id.*)  Plaintiff made no complaints about being handcuffed too tight against Defendant Celaya.  (*Id.*)  This raises an inference that the handcuffing incident did not happen.  However, the Court cannot make credibility

findings and Defendant Celaya couldn't recall the incident. Therefore, the Court views the facts in the light most favorable to Plaintiff as concerns Defendant Celaya tightening the handcuff.

"In those tight handcuffing cases in which courts have found excessive force, the arrestee was either in visible pain, complained of pain, alerted the officer to pre-existing injuries, sustained more severe injuries, was in handcuffs for a longer period of time, asked to have the handcuffs loosened or released, and/or alleged other forms of abusive conduct in conjunction with the tight handcuffing." *Shaw*, 2005 WL 6117549, at * 7. The Court analyzes these factors below.

a.     Plaintiff's Complaint(s) of Pain

Plaintiff had an interview with Sergeant Waters on March 16, 2019, wherein Plaintiff indicated that he informed Defendant Celaya of the tight cuffs. (ECF Nos. 32-4 at 15–16; 32-6 at 2.) Plaintiff did not indicate that he complained to him more than one time. (*See* ECF Nos. 32-4 at 15–16; 32-6 at 2.) In his Opposition, Plaintiff stated that he was placed in cuffs and escorted downstairs to the day room. (ECF No. 44-1 at 7.) There was no conversation taking place, only orders. (*Id.*) Once the search was in progress, Plaintiff exchanged words with Defendant Martinson regarding the cuffs. (*Id.*) Plaintiff's requests went unanswered until Officer Felix was done with the search and then uncuffed Plaintiff. (*Id.*) Defendant Martinson refuted Plaintiff's claim as regards to him. (ECF No. 32-3 at 2.)

In his original CDCR 602 Form, Plaintiff did not state that he complained to Defendant Celaya more than one time. (ECF No. 32-4 at 13.) In his deposition, Plaintiff testified that after he was handcuffed, he was placed in the dayroom and Defendant Celaya returned to the cell to search it. (ECF No. 32-8 at 11.) Of note, Plaintiff also stated that there was no conversation during the escort downstairs to the day room. (*Id.* at 12.) Plaintiff testified that he complained to Defendant Celaya about the cuffs being too tight when he arrived at the day room. (*Id.*) Defendant Celaya then left to search the cell. (*Id.*

at 12–14, 17–18.)   After the encounter with Defendant Celaya, Plaintiff asked another officer to loosen the cuffs.  (*Id.* at 18.)

Considering the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff made only one complaint about the tight handcuffs to Defendant Celaya.  A single complaint relating to tight handcuffs is not sufficient to show that the handcuffing constituted excessive force.  *See Tibbs*, 469 F.3d at 666 (arresting officer entitled to summary judgment when arrestee complained that handcuffs too tight only once, experienced redness on wrists for less than two days, and did not receive medical care); *Shaw*, 2005 WL 6117549, at *7 (finding that a 15-minute handcuffing during which arrestee only once complained to defendant officer that her handcuffs were tight did not constitute excessive force).

### b.  Prolonged Period of Time

Plaintiff testified that he was in handcuffs three to four hours.  (ECF No. 32-8 at 15.) However, in his first level review 602 signed February 6, 2019, Plaintiff did not indicate how much time he was left in the handcuffs.  (ECF No. 32-5 at 60.)  Plaintiff stated that as he was escorted from the cell, the officer made the cuffs extra tight and the cuffs could not be loosened due to a broken key.  (*Id.*)  Thereafter, during an interview with Sergeant Waters on March 16, 2019, Plaintiff stated that Officer Felix loosened the handcuffs before Defendant Celaya and Officer Felix searched his assigned cell.  (ECF No. 32-6 at 2.)

Further, Plaintiff testified that Defendant Celaya told him that "we'll loosen them in a minute."  (ECF No. 32-8 at 13.)  Plaintiff also testified that he told Defendant Celaya and Officer Felix about the tight handcuffs after being escorted to the dayroom.  (*Id.* at 12.) Plaintiff then indicated that Defendant Celaya then returned to the cell to search it.  (*Id.* at 11.)  In the dayroom, Plaintiff testified that he made Defendant Martinson aware that the cuffs were too tight.  (*Id.* at 19.)  According to Plaintiff, Defendant Martinson told him he was going to have one of his officers loosen them.  (*Id.*)  Plaintiff claimed to have told this to Defendant Martinson after he had been in the cuffs, about 15 to 20 minutes into the search.  (*Id.* at 18–19.)

Defendant Martinson stated in his declaration that during a mass cell search like the one on January 9, 2019, there are often 20 to 30 officers and multiple supervisory staff present.  (ECF No. 32-3 at 2–3.)  Defendant Martinson indicated that if Plaintiff was in restraints and there was an issue that he could not address, there would've been multiple other officers, supervisory staff, and medical staff present to whom Plaintiff could have requested assistance.  (*Id.*)  Defendant Martinson also testified that he did not recall seeing Plaintiff during the mass cell search.  (*Id.* at 2.)  And if Plaintiff had complained, Defendant Martinson stated that his usual practice is to adjust the handcuffs or direct another officer to do so.  (*Id.*)  Plaintiff did testify that he also asked another officer to take the cuffs off.  (ECF No. 32-8 at 18.)

The clear inference is that Plaintiff would not have been left in handcuffs 3 to 4 hours, given his requests to the officers as well as the amount of officers present to assist in situations precisely like Plaintiff's January 19, 2019 situation.  However, the Court cannot make a credibility finding at summary judgment.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Tabares*, 988 F.3d at 1123 ("'[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' and 'all justifiable inferences are to be drawn in [the non-movant's] favor.'").  Regardless of the amount of time Plaintiff alleged he was in handcuffs in the day room, Defendant Celaya was not in the dayroom during this time, rather he was searching Plaintiff's cell.  Defendant Celaya was not the cause of any alleged prolonged wait while Plaintiff was in the dayroom.  Defendant Celaya's amount of time spent with the Plaintiff after being handcuffed was the amount of time spent to escort Plaintiff from the cell to the dayroom.  Therefore, the Court finds the amount of time spent in handcuffs caused by Defendant Celaya was *de minimis*.  *See Shaw*, 2005 WL 6117549 at *7 (finding that 15-minute handcuffing did not amount to excessive force).

### c.  Other Forms of Abusive Conduct by the Defendant

The use of excessive force by a prison official constitutes a violation of the Eighth Amendment.  *See Hudson*, 503 U.S. at 6–7.  The core judicial inquiry is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Id.*; *see also Whitley*, 475 U.S. at 320–21; *Shaw*, 2005 WL 6117549, at * 7 ("In those tight handcuffing cases in which courts have found excessive force […] other forms of abusive conduct in conjunction with the tight handcuffing.").

After reviewing the record, there is nothing that indicates in any way that Defendant Celaya did any form of violence or other abusive conduct when Plaintiff complained of the tightness of the handcuff.  Defendant Celaya explained his handcuff key was broken and he would get someone in a few minutes to loosen them.  (ECF No. 32-8 at 12–13.)  After Plaintiff's complaint, Defendant Celaya escorted him to the day room where there were many other personnel who could loosen the handcuff if Plaintiff complained.  (*Id.*)

Accordingly, the Court finds that Defendant Celaya did not act "maliciously and sadistically to cause harm." *See Hudson*, 503 U.S. at 6–7.

### d.  Severity of the Injury

Plaintiff testified that the injury occurred on his left wrist.  (ECF No. 32-8 at 24–26.) Plaintiff admitted that he had x-rays taken on his left wrist and they were negative, no broken bones or fractures.  (*Id.* at 25–26.)  Plaintiff further confirmed at his deposition that his left wrist doesn't bother him.  (*Id.*)

The Plaintiff made several health care grievances about experiencing numbness between his fingers allegedly sustained on January 9, 2019.  (ECF No. 44-3 at 39–41.)  The institutional response to Plaintiff's health care grievance, dated April 17, 2019, noted that Plaintiff made no mention of any injuries on his CDCR 7362 regarding the January 9, 2019 incident.  (*Id.* at 43–44.)  The response also confirmed that he made no reference to any injuries during his January 17, 2019 visit with the clinic RN.  (*Id.*)

On January 17, 2019, Plaintiff had a face-to-face visit with RN Kim Wyatt.  (ECF No. 32-8 at 38.)  According to the progress note, Plaintiff's chief complaint was not wrist

20-cv-00899-AJB-BGS

pain, but broken reading glasses.  (*Id.*)  RN Wyatt did indicate that Plaintiff has had a history of right wrist pain and was seen for a follow up on his wrist pain and x-ray results, where he stated he had no other health issues.  (*Id.* at 49, 53–54.)  Plaintiff was then referred to physical therapy for his right wrist.  (*Id.* at 54.)  Of significance, Plaintiff made no mention of any injury to his left wrist, which was the wrist that allegedly suffered an injury from the January 9, 2019 incident.

Given this evidence, the Court finds that Plaintiff's alleged injury to his left wrist was not severe.

### e.  Conclusion

After applying and balancing the above factors to Plaintiff's excessive force claim, IT IS RECOMMENDED that the Court finds that Defendant Celaya's application of the handcuffs was not excessive force.  The Eighth Amendment's prohibition on cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided the force is not of a sort "repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9–10.  There was no evidence that Defendant Celaya's tightening of the handcuff was applied maliciously or sadistically as is required by his Eight Amendment claim.  The undisputed evidence on Plaintiff's part was that Defendant Celaya failed to loosen the one handcuff because of a broken handcuff key.  Therefore, the Court deems Defendant Celaya's use of force to be *de minimis* and RECOMMENDS that the Court GRANT Defendants' motion on this claim of excessive force.

### C. Failure to Intervene

Prison officials have a duty to take reasonable steps to protect inmates from physical abuse.  *See Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).  "[A] prison official can violate a prisoner's Eight Amendment rights by failing to intervene."  *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995).  A prison official may be held liable under the Eighth Amendment "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  "Whether a prison official had

24

the requisite knowledge of a substantial risk is a question of fact subject to demonstrating in the usual ways, including inference from circumstantial evidence, [. . .] and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. An officer is subject to liability under a failure-to-intervene theory only if the officer had an opportunity to prevent the harm. *See Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000).

Plaintiff alleged that Defendant Martinson failed to intervene with his subordinate Defendant Celaya. (ECF No. 44-1 at 22.) Of note, Plaintiff never reported such conduct by Defendant Martinson in any of his grievances. (*See* ECF No. 1 at 20–21, 23, 30, 32.) The first time Plaintiff mentioned Defendant Martinson's involvement was in his Complaint filed May 13, 2020, almost 15 months after the January 9, 2019 incident. (*See* ECF No. 1.) In his deposition, Plaintiff testified that he made Defendant Martinson aware that his cuffs were too tight. (ECF No. 32-8 at 19–20.) Defendant Martinson allegedly told Plaintiff he would have one of the officers do it. (*Id.*) Defendant Martinson was supervising at the podium and one of the officers walked Plaintiff over to him. (*Id.*) Plaintiff waited, and no one loosened his cuffs. (*Id.* at 20.) Plaintiff waited a few minutes then spoke to Martinson again. (*Id.* at 21.) This second conversation took place a couple of minutes after the first, where Defendant Martinson allegedly told him that he left his padded cuffs at home and he's a big boy. (*Id.* at 21–22.)

Of note, this alleged conversation was not reported in any of Plaintiff's grievances. In fact, there is nothing in the record until his Complaint that suggested Defendant Martinson failed to intervene. Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1).

The only evidence in the record regarding Defendant Martinson's alleged failure to intervene comes from Plaintiff's deposition.

In his declaration, Defendant Martinson did not recall seeing Plaintiff in restraints during the mass cell search on January 9, 2019.  (ECF No. 32-3 at 2.)  Nor did Defendant Martinson recall Plaintiff informing him or other staff that his handcuffs were too tight.  (*Id.*)  If an inmate complained, Defendant Martinson indicated that he would have loosened the handcuffs or direct another officer to assist since there is usually 20 to 30 officers, along with multiple supervisory staff, monitoring the inmates present and assisting with search efforts and monitoring the inmates.  (*Id.*)  If there was an issue with Plaintiff's restraints, Defendant Martinson declared that the multiple officers, supervisory and medical staff were available to whom Plaintiff could have asked for assistance.  (*Id.* at 2–3.)  Of note, during his March 16, 2019 interview with Correctional Sergeant Waters, Plaintiff stated that Officer Felix loosened the handcuffs before Defendant Celaya and Officer Felix searched his assigned cell.  (ECF No. 32-6 at 2.)  Therefore, there would be no need to contact Defendant Martinson about the tightened handcuffs.  Notwithstanding, Plaintiff admitted that Defendant Martinson offered to help Plaintiff by having one of his officers do it.  (ECF No. 32-8 at 19.)  In fact, Officer Felix did loosen the handcuffs.  (ECF No. 32-8 at 18.)

A prison official may be held liable under the Eighth Amendment "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 847.  The Court finds that there is a genuine dispute as to a material fact concerning whether the Plaintiff put Defendant Martinson on notice of tightened handcuff.  There is also a genuine dispute as to whether Defendant Martinson left Plaintiff with the tightened handcuff 3 to 4 hours, thereby failing to take reasonable measures to abate it.

However, the Court finds that Defendant Martinson met his burden that Plaintiff did not face a substantial risk of serious harm.  Plaintiff testified that the injury occurred on his left wrist. (ECF No. 32-8 at 24–26.)  Plaintiff also admitted he had x-rays taken on his left

wrist and they were negative, with no broken bones or fractures.  (*Id.* at 26.)  Plaintiff further indicated at his deposition that his left wrist did not bother him.  (*Id.*)

Further, Plaintiff's medical records did not indicate that he suffered serious harm from the handcuffed left wrist.  On January 17, 2019, Plaintiff had a face-to-face visit with RN Kim Wyatt.  (*Id.* at 38.)  According to the progress note, Plaintiff's chief complaint was broken reading glasses, not wrist pain.  (*Id.*)  Further, on March 4, 2019, Dr. Jelena Nikolic's Progress Notes indicated that Plaintiff's chief complaint was chronic right wrist pain.  (*Id.* at 53.)  Dr. Nikolic wrote that Plaintiff had a history of right wrist pain, and he was there for a follow up wrist pain and x-ray results.  (*Id.* at 49, 53–54.)  Dr. Nikolic indicated that Plaintiff stated he had no other health issues.  (*Id.*)  Plaintiff was then referred to physical therapy for his right wrist.  (*Id.* at 54.)  Of significance, Plaintiff made no mention of any injury to his left wrist, which was the wrist that allegedly suffered an injury from the January 9, 2019 incident.  This evidence indicates that Plaintiff did not face a substantial risk of serious harm.

In fact, the institutional response to Plaintiff's grievance, dated April 17, 2019, noted that Plaintiff made no mention of any injuries on his CDCR 7362 regarding the January 9, 2019 incident.  (ECF No. 44-3 at 43.)  The response also confirmed that Plaintiff made no reference to any injuries during his January 17, 2019 visit with the clinic RN.  (*Id.*)

From this evidence the Court finds that Defendant Martinson has met his burden on this issue.  The Court concludes that the lack of a significant injury as indicated by the medical reports supports the finding that Plaintiff did not face a substantial risk of serious harm.  Further, Plaintiff's failure to report an injury to his left wrist also supports this conclusion.

If the moving party has carried its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Scott*, 550 U.S. at 380 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87).

In his declaration attached to his Opposition, Plaintiff declared that he was injured by the tight handcuffs and has a scheduled surgery. (ECF No. 44-4 at 2.) However, Plaintiff provided no documents indicating he had such a surgery scheduled. And admittedly Plaintiff is not a doctor who can make an assessment as to his alleged injury. At his deposition, Plaintiff testified that the left wrist did not bother him. (ECF No. 32-8 at 26.) Plaintiff first testified that he experienced numbness just on his right wrist, but then he testified it was only on his left wrist. (*Id.* at 24–26.) Plaintiff confirmed that he had an x-ray on his left wrist and the result was negative, with no fractures or broken bones. (*Id.* at 26.)

The nonmoving party may not rely on allegations in the complaint, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis in original) (internal citation omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). "An issue of material fact is genuine 'if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.'" *Thomas*, 611 F.3d at 1150 (citing *Long*, 442 F.3d at 1185). If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.

Although Plaintiff declared he was injured, he provided no specific facts which would create an issue of material fact as to whether there was a substantial risk of serious harm by the tightened handcuff. Of note, the Plaintiff is not a medical expert who is able to analyze his left wrist for injury and his medical records do not support that he even had an injury to his left wrist. All of Plaintiff's complaints to medical personnel regarded his right wrist. Plaintiff's own testimony supported that any injury to his left wrist was *de minimus*, since the x-rays were negative and Plaintiff had no broken bones or fractures. Plaintiff was specifically asked at his deposition as to what were the continuing issues he

was having with either wrist, to which he responded that the right one was hitting on itself, but his left one did not bother him.  (ECF No. 32-8 at 26.)

Therefore, IT IS RECOMMENDED that the Court GRANT Defendants' motion for summary judgment as to Plaintiff's claim of failure to intervene.

### D. Plaintiff's First Amendment Retaliation Claim

Of fundamental import to prisoners are their First Amendment "right[s] to file prison grievances," *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003), and to "pursue civil rights litigation in the courts[,]" *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices.  *See Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021); *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).  "And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution apart from any underlying misconduct they are designed to shield."  *Rhodes*, 408 F.3d at 567; *see, e.g.*, *Pratt v. Rowland*, 65 F.3d 802, 806 & n. 4 (9th Cir. 1995) ("[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes. That retaliatory actions by prison officials are cognizable under § 1983 has also been widely accepted in other circuits.") (citing *Schroeder*, 55 F.3d at 461; *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994); *Frazier v. Dubois*, 922 F.2d 560, 561–62 (10th Cir. 1990); *Madewell v. Roberts*, 909 F.2d 1203 (8th Cir. 1990); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987); *Bridges v. Russell*, 757 F.2d 1155 (11th Cir. 1985).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes*, 408 F.3d at 567–68 (citing *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000); *Barnett*, 31 F.3d at 815–16.

The Ninth Circuit has "repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 904–05 (2014) (citing *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011)).  The inmate-plaintiff must provide "probative evidence to establish a crucial link in the logical chain." *See Pratt*, 65 F.3d at 807–08 (finding timing and speculation alone insufficient for retaliation claim.).  A retaliation claim will not stand when premised simply on "the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this.'" *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000).  The inmate must demonstrate a nexus between the alleged adverse conduct and the protected speech. *Id.* There must be a showing that the adverse action was taken out of "retaliatory animus" to "silence and punish" the inmate based on their protected conduct, and not for some other reason. *See Shepard v. Quillen*, 840 F.3d 686, 689, 691 (9th Cir. 2016).

Additionally, "[t]he plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct he complains of." *Pratt*, 65 F.3d at 806. Legitimate correctional goals include "preserving institutional order and discipline." *Barnett*, 31 F.3d at 816; *see also Procunier v. Martinez*, 416 U.S. 396, 412 (1974) (same).

### 1. Defendant Celaya

In his Complaint, Plaintiff alleged that Defendant Celaya tightened his handcuffs too tight for punitive purposes for filing grievances.  (ECF No. 1 at 3.)  In his opposition to Defendants' motion for summary judgment, Plaintiff infered that Defendant Celaya chose his cell to search, that it was not random.  (ECF No. 44-1 at 2, 24.)  Plaintiff further claimed to have filed multiple grievances against Defendant Celaya, yet at his deposition he testified that other than on July 9, 2018 and January 9, 2019, there were no other interactions with Defendant Celaya besides head nods towards each other in the yard.  (ECF No. 32-8 at 27.)

Defendant Celaya declared that in a mass cell search, the cells assigned to officers to search are done randomly and he did not choose to search Plaintiff's cell.  (ECF 32-2 at

2–3.)  Defendant Celaya could not recall Plaintiff telling him the handcuffs were too tight during the mass cell search.  (*Id.* at 3.)  Further, Defendant Celaya declared he had no knowledge of any grievance by Plaintiff against him when he was asked to search the cell. (*Id.*)  The only major interaction Defendant Celaya had with the Plaintiff before the January 9, 2019 incident was in July 2018, where Defendant Celaya searched the Plaintiff and discovered a weapon and a SD card.  (*Id.* at 4.)  Defendant Celaya indicated that he then issued a rules violation report, consistent with prison procedures.  (*Id.* at 4, 9.)

The issue presented is whether Defendant Celaya over tightened Plaintiff's handcuffs in order to punish him for exercising his First Amendment right to file a grievance against Defendant Celaya.  There must be a showing that the adverse action was taken out of "retaliatory animus" to "silence and punish" the inmate based on their protected conduct, and not for some other reason.  *See Shepard*, 840 F.3d at 691; *Garcia v. Healy*, No. 16-CV-05871-NC-PR, 2018 WL 1471922, at *5 (N.D. Cal. Mar. 2018); *Ingram v. Sterling*, No. 14CV02691GPCDHB, 2017 WL 9565356, at *11 (S.D. Cal. Jan. 2017) (citing *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) ("[P]laintiff must show that the protected conduct was a 'substantial' or 'motivating' factor in the defendant's decision to act.").

Plaintiff's claim that Defendant Celaya selected to search his cell during the mass cell search is speculation and unsupported by the record.  Plaintiff's allegation is based on the notion that Defendant Celaya had retaliatory animus for Plaintiff's grievance against him and therefore Defendant Celaya wanted to punish him.  Plaintiff offered no evidence other than this alleged coincidence.[2]  The record supports the fact that during mass cell searches the officers are selected randomly to search specific cells.

---

[2] In his declaration, Plaintiff stated that Defendant Celaya tightened the handcuffs and left him in the dayroom in retaliation for his filing grievances.  (ECF No. 44-4 at 4.)

Further, the record does not establish that Defendant Celaya had any notice of the previous grievance allegedly filed against him.   To avoid summary judgment, the nonmovant cannot rest solely on conclusory allegations, *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986), but must present "specific facts showing there is a genuine issue for trial[,]" *Anderson*, 477 U.S. at 256.  Plaintiff's statement in his declaration did not claim that Defendant Celaya knew of Plaintiff's grievance.  Further, Defendant Celaya declared that he did not know of any grievance filed by the Plaintiff before he searched Plaintiff's cell.  Without notice, Plaintiff's claim of retaliatory animus fails.

Regarding the adverse action taken, extra tightened handcuffs, there is no evidence in the record to support that such conduct was done with retaliatory animus which chilled Plaintiff's rights to file further grievances against the officer.[3]  There were no statements made by Defendant Celaya in the record that would support such a conclusion.  In fact, taken the facts as testified by Plaintiff, Defendant Celaya told him that his handcuff key was broken, and he would seek help.  (*See* ECF No. 32-8 at 12–13.)  Such conduct is contrary to the allegation that Defendant Celaya had retaliatory intent.

Further, handcuffing an inmate during a mass cell search did reasonably advance a legitimate correctional goal.   Legitimate correctional goals include "preserving institutional order and discipline." *Barnett*, 31 F.3d at 816.  Here, the mass cell search involved approximately 100 inmates at a time of heightened security due to an institutional security threat—dangerous contraband was found in Plaintiff's facility, and the prison was on modified program because additional contraband was suspected.  (ECF Nos. 32-2 at 3; 32-7 at 5–6.)  Even taking Plaintiff's statements as true that Defendant Celaya could not loosen Plaintiff's handcuffs when he requested due to a broken key and that Plaintiff had

---

[3] The Plaintiff after the January 9, 2019 search submitted grievances against Defendant Celaya. The supposed adverse action must chill a person of ordinary firmness from engaging in the protected conduct (here, filing inmate grievances). *Rhodes*, 408 F.3d at 567–68. A one-time incident of a tightened handcuff that could not be loosened due to a broken handcuff key, which occurred during an escort for a mass cell search involving 100 inmates and during a time of heightened security and activity, would not chill an ordinary inmate from filing grievances.

to wait until arriving to the dayroom area where Defendant Celaya's partner loosened them, this conduct is supported by the correctional goal of "preserving institutional order and discipline" during a time of heightened security issues and a facility-wide mass cell search involving 100 inmates. *Barnett*, 31 F.3d at 816; *see also Howell v. Johnson*, No. 2:19-CV-0611 DB P, 2020 WL 8816313, at *4 (E.D. Cal. Jan. 29, 2020) (citing *Barnett*, 31 F.3d at 816; *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)) ("[T]he Ninth Circuit has held that preserving institutional order, discipline, and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation."); *Jimenez v. Sambrano*, No. 04CV1833-L-PCL, 2007 WL 4961207, at *3 (S.D. Cal. Sept. 2007), report and recommendation adopted, No. 04CV1833-L-PCL, 2008 WL 538441 (S.D. Cal. Feb. 2008) (finding that the removing plaintiff out of the cell by force served legitimate correctional goals, in a case where the defendant officers tried to handcuff plaintiff due to a cell search during a random inspection.).

Accordingly, this Court RECOMMENDS that summary judgment as to his First Amendment retaliation claim against Defendant Celaya be GRANTED.

### 2.   Defendant Martinson

In his complaint, Plaintiff alleged that Defendant Martinson enabled his subordinate to retaliate and to use excessive force.  (ECF No. 1 at 2, 4.)  Plaintiff did not allege retaliation by Defendant Martinson.  (*See id.* at 2–4.)  In his Opposition, Plaintiff asserted a violation of his First Amendment rights against Defendant Celaya and Defendant Martinson.  (ECF No. 44-1 at 4.)  However, in the First Amendment retaliation section of his Opposition, Plaintiff made no mention of Defendant Martinson retaliating against him. (*Id.* at 18.)  Plaintiff's allegation against Defendant Martinson regards his failure to intervene with his subordinate, Defendant Celaya.  (*Id.* at 22.)  Further, Plaintiff never mentioned anything regarding Defendant Martinson's conduct in his declaration.  (ECF No. 44-4 at 1–5.)

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an

inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes*, 408 F.3d at 567–68 (9th Cir. 2004) (citing *Resnick*, 213 F.3d at 449; *Barnett*, 31 F.3d at 815–16).

To avoid summary judgment, the nonmovant cannot rest solely on conclusory allegations, *Berg*, 794 F.2d at 459, but must present "specific facts showing there is a genuine issue for trial[,]" *Anderson*, 477 U.S. at 256. Plaintiff has not alleged any facts or provided any evidence in the record that would show Defendant Martinson took an adverse action against him because of his protected conduct. Plaintiff's sole claim against Defendant Martinson was a failure to intervene, which the Court has addressed *supra*. Despite needing to show that the adverse action was taken out of "retaliatory animus" to "silence and punish" the Plaintiff based on his protected conduct, and not for some other reason, *Shepard*, 840 F.3d at 691, there is nothing in the record which suggests that Defendant Martinson's alleged failure to intervene was motivated by retaliatory animus.

Accordingly, this Court RECOMMENDS that summary judgment as to this First Amendment retaliation claim against Defendant Martinson be GRANTED.

### E. Qualified Immunity

Qualified Immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine of Qualified Immunity entitles government officials to "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Qualified Immunity's purpose is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The Qualified Immunity doctrine was made to

create a way to resolve unwarranted claims against government officials at the earliest possible stage of litigation. *Id.*

The courts administer a two-prong analysis in determining whether a government official is entitled to Qualified Immunity.[4] *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). In examining the alleged facts in favor of the plaintiff, the court must first consider whether the alleged facts show the government official's actions violated the plaintiff's constitutional rights. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*; *accord Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 711 (9th Cir. 2010).

However, if a violation could be made out on a favorable view of the plaintiff's facts, then the court must next determine whether the constitutional right purportedly violated was clearly established in the specific context of the case at hand. *Saucier*, 533 U.S. at 201. "A right is 'clearly established' when its contours are sufficiently defined, such that 'a reasonable official would understand that what he is doing violates that right.'" *Foster v. Runnels*, 554 F.3d 807, 815 (9th Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). If the law does not "put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. If, however, a reasonable official would have known that the alleged conduct was in violation of a clearly established constitutional right, then immunity is forfeited. *Id.* "[T]he law may be clearly established even if there is no case directly on point. [. . .] It is enough if 'in the light of pre-existing law the unlawfulness is apparent.'" *Inouye v. Kemna*, 504 F.3d 705, 715 (9th Cir. 2007) (quoting *Wilson*, 526 U.S. at 615).

---

[4] Courts are not required to conduct the Saucier two-prong analysis in a particular sequence. *Pearson*, 555 U.S. at 236.

The general law regarding overtightened handcuffs was clearly established at the time of the incident. *See*, *e.g.*, *Meredith*, 342 F.3d at 1063–64 (finding no Qualified Immunity on Fourth Amendment claim when IRS agent investigating organization for tax crimes tightly handcuffed plaintiff, who resided on the premises but had no connection with the organization, and refusal to loosen handcuffs for 30 minutes despite her complaints); *Wall*, 364 F.3d at 1109–10, 1112 ("It is well-established that overly tight handcuffing can constitute excessive force."); *LaLonde*, 204 F.3d at 960 ("A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force."); *Alexander*, 64 F.3d at 1322–23 (finding that the defense of qualified immunity is not available to the officers on Plaintiff's excessive-force claim due to the facts, if believed by the jury, could reasonably be found to demonstrate excessive force that was used against Plaintiff); *Palmer*, 9 F.3d at 1436; *Gregory v. Adams*, No. CIV S-05-1393-FCD-EFB, 2008 WL 486013 at *1, *5 (E.D. Cal. Feb. 2008) ("Overly tight handcuffs can constitute excessive force."); *Buckley v. Evans*, No. 2:02-cv-01451-JKS, 2007 WL 2900173, at * 8 (E.D. Cal. 2007). Further, in the Ninth Circuit, the right to be free from retaliation is well established. *Bruce*, 351 F.3d at 1289–90. Thus, as to the second prong, if it would be clear to a reasonable officer that such actions as alleged by the Plaintiff would be unconstitutional, qualified immunity would not shield such actions from liability. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.").

Under the first prong, the Court concludes that Defendant Celaya and Defendant Martinson did not retaliate against the Plaintiff, nor use excessive force in the use of handcuffs on the Plaintiff. Further, the Court concludes that Defendant Martinson did not fail to intervene. Therefore, since the Court has found that no constitutional right has been violated, it need not address the second prong of qualified immunity. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations

established, there is no necessity for further inquiries concerning qualified immunity."); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach  to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

### F.  Defendants' Objections

Defendants objected to certain parts of Plaintiff's declaration.  (ECF No. 47 at 10–12; *see also* ECF No. 44-4.)  Given the Courts recommendation herein, and its non-reliance on the objectionable paragraphs, the Court need not rule on these objections.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons discussed, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) adopting this Report and Recommendation; and (2) **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 32).

**IT IS ORDERED** that no later than **May 23, 2022**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objection to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **June 6, 2022**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**.

Dated:  May 2, 2022

Hon. Bernard G. Skomal
United States Magistrate Judge